UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EDGAR CRUZ VELEZ, | ) |
| Plaintiff | ) |
| | ) |
| v. | )   C.A. No. 13-cv-30032-MAP |
| | ) |
| CAROLYN COLVIN, | ) |
| Acting Commissioner, Social | ) |
| Security Administration, | ) |
| Defendant | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 18 & 24)

March 24, 2014

PONSOR, U.S.D.J.

## I.  INTRODUCTION

Plaintiff, Edgar Cruz Velez, seeks a reversal or remand
of the final decision of Defendant, Acting Commissioner of
the Social Security Administration, denying his application
for disability benefits.  On January 16, 2014, counsel
appeared for argument on Plaintiff's Motion for Order
Reversing Decision of the Commissioner, (Dkt. No. 18), and
Defendant's Motion for Order Affirming the Decision of the
Commissioner, (Dkt. No. 24).  The court took the matter
under advisement.  For the reasons stated below, the court

will allow Plaintiff's motion and deny Defendant's motion.

## II.   FACTUAL BACKGROUND

At the time of his initial application, Plaintiff was a
43 year old male (d.o.b. 10/11/1967) claiming disability due
to arthritis, depression, and other mental impairments.  He
attended high school until 10th grade in Puerto Rico and
then obtained a GED.  Plaintiff has worked as a laborer,
most recently at Walmart unloading trucks.  Plaintiff
separated from his wife and currently lives with his ailing
mother.  The following recitation of facts is drawn from the
Social Security Administration's Administrative Record
(A.R.), (Dkt. No. 14).

### A.   Medical Background

#### 1.   Physical Examinations

Plaintiff reported injuring his right ankle at work
while pulling a pallet on January 17, 2010.  Plaintiff's
ankle became swollen, and he experienced increasing
discomfort and pain.  (A.R. 300.)  He continued to work that
day and a few hours the following day, but he has not
returned to work since January 18, 2010.

In March 2010, Plaintiff sought treatment for his ankle

from Dr. Morton D. Lynn, who diagnosed synovitis[1] and recommended ankle support.  (A.R. 301-2.)  Plaintiff received a steroid injection "which provided little relief." (A.R. 421.)  On July 29, 2010, he saw Dr. Thomas McDonald at New England Orthopedic Surgeons (NEOS), who diagnosed him with anterior ankle bony impingement.  Dr. McDonald's first course of treatment was a brace with a heel lift; if symptoms persisted, Dr. McDonald regarded surgery as the next option.

Plaintiff also reported injuring his right knee and lower back region during that same work incident.  (A.R. 303.)  Between July and August 2010, Plaintiff visited the Sports and Rehabilitation Center at Noble Hospital nine times for treatment of his lower back pain.  On August 11, 2010, the physical therapist referred Plaintiff back to his doctor, as Plaintiff experienced "no appreciable improvement" from therapy.  (A.R. 341.)  On September 22, 2010, Plaintiff saw another NEOS doctor, on referral from his primary care physician, for chronic low back pain.

---

[1]  Synovitis is, "in general, when unqualified, the same as arthritis."  Stedman's Medical Dictionary 1746 (26th ed. 1995).

3

(A.R. 706.)  He was diagnosed with L5-S1 degenerative disk disease, for which the doctor recommended physical therapy. (A.R. 707.)  On September 24, 2010, another doctor at NEOS saw Plaintiff for his knee pain.  Plaintiff was diagnosed as having "post-traumatic chondromalacia patella[2] on the right."  The doctor recommended continued physical therapy and started Plaintiff on a course of anti-inflammatory drugs.  (A.R. 705.)

In November 2010, Plaintiff went to Pioneer Spine and Sports Physicians for a consultation for his lower back pain.  Dr. Rose Bernal-Larioza determined that he likely had intervertebral lumbar disc displacement and spondylosis,[3] and recommended an epidural injection if his pain persisted. (A.R. 618.)  In January 2011, Dr. McDonald performed an ankle arthroscopy and debridement of Plaintiff's anterior distal tibial osteophyte.  (A.R. 685.)  Plaintiff wore an ambulating Cam boot for a little over three months before

---

[2] Chondromalacia is the softening of the cartilage and, when located in the knee, can create a painful condition. Stedman's Medical Dictionary 332 & 1311.

[3] Spondylosis is the ankylosis, or the stiffening or fixation, of the vertebra.  Id. at 93 & 1656.

4

transitioning back into a brace; his pain improved significantly compared to what it was before the procedure. Dr. McDonald anticipated that Plaintiff would need twelve weeks for his ankle to heal from surgery, with an additional six months of recovery.  (A.R. 621.)

    2.   Mental Examinations

    On May 6, 2010, Plaintiff sought treatment for anger issues, insomnia, panic attacks, and depression at the Gandara Mental Health Center.  He reported taking Lexapro and Clorazepam as prescribed by his primary care physician. The clinician stated that Plaintiff had good judgment and insight, clear speech, and logical thought, and was cooperative; Plaintiff also appeared depressed and reported forgetfulness, insomnia, and some auditory hallucinations. (A.R. 371.)  The clinician also noted that Plaintiff was going through a divorce and was not employed.  His preliminary diagnosis was social anxiety, with panic attacks.  Plaintiff was assessed a GAF score of 53.[4]  (A.R.

---

    [4]   The GAF score is used by mental health physicians and clinicians to rate the social, occupational, and psychological functioning of adults.  Munson v. Barnhart, 217 F. Supp. 2d 162, 164 n.2 (D. Me. 2002).  A score between 51 and 60 denotes moderate symptoms, wherein the patient has

373.)

On a psychiatric evaluation form dated June 24, 2010, the clinician noted that Plaintiff reported a history of incarceration, stating "I took something that didn't belong to me." (A.R. 365.) The form noted that Plaintiff presented as cooperative, well-groomed, alert and awake, with good eye contact. (A.R. 366.) He also appeared as anxious, irritable, and in a depressed mood. The clinician gave him a GAF score of 55 and diagnosed him as having dysthymia,[5] mixed anxiety, and depression. (A.R. 367-68.)

On August 4, 2010, Rene Piñero, M.Psy., sent a treatment certification form to the Westfield Housing Authority, requesting assistance on behalf of Plaintiff. (A.R. 359.) On the form, Mr. Piñero stated that Plaintiff was receiving individual psychotherapy and psychotropic medication through Gandara's adult outpatient program.

---

"moderate difficulty in social, occupational, or school functioning." Marcotte v. Callahan, 992 F. Supp. 485, 487 n.4 (D.N.H. 1997).

[5] Dysthymia is a "chronic mood disorder manifested as depression for most of the day, more days than not," with other accompanying symptoms such as insomnia and low self-esteem. Stedman's Medical Dictionary 536.

Additionally, Mr. Piñero explained that Plaintiff suffered
from "symptoms of anxiety and social phobia which make it
hard for him to interact with others and deal with stressful
environments."  (Id.)

On August 11, 2010, David Allen, N.P. completed a
medical report in support of Plaintiff's application for
cash and medical assistance under the Massachusetts
Department of Transitional Assistance.  Mr. Allen stated
that Plaintiff had impairments of the musculoskeletal system
and a mental disorder.  Specifically, Plaintiff had lower
back pain and right ankle and knee problems, in addition to
his anxiety, social phobia, and anhedonia.[6]  (A.R. 379.)
Mr. Allen concluded that Plaintiff had physical and mental
impairments that affected his ability to work and were
expected to last more than a year.  (A.R. 383.)

On  November 5, 2010, Mr. Piñero wrote on another
treatment certification form that he was treating Plaintiff
for social phobia and generalized anxiety disorder, "which
make it hard for him to interact with others and deal with

---

[6] Anhedonia is defined as the "[a]bsence of pleasure
from the performance of acts that would ordinarily be
pleasurable."  Id. at 90.

7

stressful environments." (A.R. 480.) Plaintiff attended two psychotherapy sessions every week, was on medication, and was showing some improvement. Further, the psychotherapist wrote that Plaintiff was unable to work because of his mental and physical health conditions.

On October 18, 2010, Dr. Robert Wing conducted a psychological evaluation of Plaintiff. Dr. Wing noted that Plaintiff looked tired and unshaven; he had a slow gait that was marked by a limp; he appeared tense and depressed as he sat through the interview; he communicated fairly well in English. As to orientation, Dr. Wing determined that Plaintiff was alert but not oriented to season or date; his thinking was clear and organized, but Plaintiff could not compute serial sevens, spell "world" forwards or backwards correctly in either Spanish or English, and remembered only one of three recall words following a ten-minute delay. Dr. Wing assessed Plaintiff with a GAF score of 48 and diagnosed him with major depressive disorder, generalized anxiety disorder, panic disorder with agoraphobia, social phobia, and learning disorder. (A.R. 387.)

On May 31, 2011, Mr. Piñero completed a Medical Source

Statement of Ability to do Work-Related Activities

(Mental).[7]  (A.R. 510.)  The doctor assessed Plaintiff as

having moderate limitations in understanding, remembering,

and carrying out short and simple instructions and marked

limitations in understanding, remembering, and carrying out

detailed instructions due to his difficulty in concentrating

and remembering things.  (A.R. 511.)  Specifically, Mr.

Piñero remarked on Plaintiff's difficulty concentrating and

remembering detailed instructions, facts and appointments

during the assessment process.  (Id.)  Furthermore, the

doctor assessed Plaintiff as having marked limitations in

his ability to interact appropriately with the public,

supervisors, and co-workers, as well as to respond

appropriately to work pressures and changes in routine, due

to his severe anxiety and self-esteem issues.  (A.R. 511-2.)

However, Dr. Piñero opined that Plaintiff would be able to

---

[7]   The scale on the Medical Source Statement of
Ability to Do Work Related Activities is: none, meaning
absent or minimal limitations; slight, meaning mild
limitations but the person can generally function well;
moderate, meaning some limitations but still able to
function satisfactorily; marked, meaning serious limitation
where the ability to function is severely limited but not
precluded; and extreme, meaning a major limitation where
there is no useful ability to function.  (A.R. 510.)

manage his benefits on his own and in his best interest.
(A.R. 513.)

B.  State Agency Opinions

The non-examining state agency psychologist, Dr. Carol
Montgomery, concluded on June 28, 2010, that there was
insufficient evidence in the record on which she could base
an opinion.  (A.R. 307.)  In November 2010, another non-
examining state agency psychologist, Dr. Ginette Langer,
concluded that Plaintiff had affective, anxiety-related, and
substance addiction disorders, as well as dysthymia.  She
further opined that Plaintiff had a _moderate_ degree of
limitation in his activities of daily living, social
functioning, and maintaining concentration, persistence, and
pace.  (A.R. 496.)  Dr. Langer made the following notation
about her review:

> Though there are signs/sx of depression and panic,
> there are inconsistencies in the MER [medical evidence
> record] raising credibility issues.  Cl [claimant]
> responses on MMSE is not consistent with his hx
> [history] or his self report that he can read/write and
> has GED, shops on computer. He also noted command AH
> [auditory hallucination] at CE [claimant exam] while
> Gandara TS noted AH of mumbling only.  CL reported he
> is unable to go out alone while other MER noted anxiety
> regarding going out and won't go to mall but not that
> he couldn't go out alone.  Third party reported he pays

own bills and reported such at CE though he denied the ability on 3373.  He told TS he is not working due to work accident. Due to inconsistencies, only partially credible.

(A.R. 498.)

Dr. Langer found Plaintiff moderately limited in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods.  She found no significant limitation in Plaintiff's ability to remember locations and work-like procedures or to understand and remember very short and simple instructions.  Moreover, she found no significant limitations in Plaintiff's ability to carry out very short and simple instructions and to perform activities within a schedule, maintain regular attendance and be punctual, to work in coordination with or proximity to others without distraction, and to make simple work-related decisions.  (A.R. 500.)

On November 9, 2010, Dr. Katrin Carlson, Psy.D., completed a treating physician report concerning the psychodiagnostic interview she conducted on Plaintiff.  She stated that he maintained good eye contact throughout the

interview and "was attentive and otherwise appeared to be a reliable reporter." (A.R. 468.) Plaintiff performed poorly on the Folstein Mini-Mental Status Examination: serial 7 subtraction; orientation to year, season, or date; spelling in English or Spanish; recalling any of three words after a brief delay; and adequately copying a five-sided intersecting design. The doctor noted that "the deficits seen on the Folstein exceed what would be expected for someone of his intellectual and educational background." (A.R. 469.) In her summary and prognosis, Dr. Carlson wrote, "It is unclear why the claimant has not looked for a job since leaving WalMart, although he feels 'phobic' around people. However, he does appear to have had a relatively stable work history per his report, prior to leaving his job at the beginning of this year." (A.R. 473.) She diagnosed him with dysthymic disorder, panic disorder without agoraphobia, and alcohol abuse. She found his prognosis "guarded."

## C.   Application, Appeal, and Hearing

On February 4, 2010, Plaintiff filed his application for benefits, which was denied on June 29, 2010. His

application was again denied on reconsideration in November 2010. Plaintiff filed a timely request for a hearing with an Administrative Law Judge (ALJ) in December 2010. Plaintiff obtained counsel, who represented him at the ALJ hearing, as well as in this current action.

On June 28, 2011, Plaintiff appeared with counsel at a hearing in front of the ALJ. Plaintiff testified at the hearing that he last worked for Walmart unloading trucks; he had stopped working after a work-related injury and could not return because of his pain problems. Plaintiff also testified that his mental conditions -- panic attacks, anxiety, and depression -- prevented him from being able to work. Plaintiff stated that he lived with his mother, after having lived with a friend when Plaintiff and his wife separated. Plaintiff asserted that he, along with a personal care attendant, provided care to his ailing mother. He would go out once or twice a month to a friend's house to drink beers.

On December 7, 2011, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled.

D. <u>ALJ's Decision</u>

The ALJ followed the five-step sequential disability determination. At step one, he determined that Plaintiff had not been engaged in substantial gainful activity since the date of his alleged disability onset. At step two, he found that Plaintiff had the severe mental impairments of dysthymic disorder, depressive disorder, learning disorder, social phobia, panic disorder with agoraphobia, avoidant personality, and alcohol abuse; he found that Plaintiff had the severe physical impairments of lumbar stenosis and radiculitis and disc displacement, lumbar spondylosis, right knee and ankle impairment, and obesity. (A.R. 17.)

In discussing the evidence (written and testimonial), the ALJ dedicated significant discussion to the low credibility of Plaintiff's allegations of disability. (A.R. 22.) After considering the factors laid out in Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir. 1986), the ALJ determined that Plaintiff was "less than fully credible" on five points: (1) English speaking abilities; (2) ability to socialize; (3) criminal activity; (4) failure to follow medical advice with regard to obesity; and (5) the inconsistencies between the medical evidence and

Plaintiff's view of his mental physical limitations.  The
ALJ specifically contrasted Plaintiff's testimony at his
hearing that he could not speak nor understand more than a
little English with Dr. Wing's notation that Plaintiff
communicated fairly well, despite apologizing repeatedly for
his broken English.  (Id.)  Also, the ALJ relied on
Plaintiff's admitted "involvement in larceny" as one basis
for his skepticism about Plaintiff's veracity.

    In summing up his conclusion regarding Plaintiff's
credibility, the ALJ stated, "I note that none of the above
factors, in isolation, would in my view justify concluding
that the claimant's allegations of disability are
incredible.  Taken together, however, and having had the
opportunity to observe his demeanor, it is my considered
opinion that his testimony must be viewed with caution."
(Id.)

    At step three, the ALJ found that Plaintiff's
impairments did not meet or medically equal an entry on the
List of Impairments.  Proceeding nonetheless to step four,
the ALJ found that Plaintiff had a residual functional
capacity (RFC) to perform light work, "except he would have

a sit/stand option at his will, would be isolated from the public, and would have no more than occasional contact with others." (A.R. 25.) However, given those limitations, Plaintiff was unable to return to past work. Finally, at step five, the ALJ determined that there were a significant number of jobs in the local and national economies that Plaintiff could perform, such as an assembler, inspector, or packer. Thus, the ALJ determined that Plaintiff was not disabled.

Plaintiff appealed this decision to the Appeals Counsel, which denied his request. Thus, the ALJ's decision became final and subject to judicial review.

## IV.  DISCUSSION

### A.  Legal Standard

The Social Security Act sets forth the requirements for receiving disability insurance:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or

16

whether he would be hired if he applied for work.
42 U.S.C. § 423(d)(2)(A).  In applying this standard, the
plaintiff "has the burden of showing a disability serious
enough to prevent him from working at his former jobs, at
which point the burden shifts to the [Commissioner] to show
the existence of other jobs in the national economy that the
[plaintiff] can nonetheless perform."  Vazquez v. Sec'y of
Health & Human Svcs., 683 F.2d 1, 2 (1st Cir. 1982).

    In addition to considering the medical evidence
established by the opinions of a plaintiff's medical
providers, the ALJ must also consider the plaintiff's
subjective assessment of disability.   In Avery v. Sec'y of
Health & Human Svcs., 797 F.2d 19, 29 (1st Cir. 1986), the
First Circuit outlined six factors as relevant to assessing
the subjective complaints of pain or other symptoms: (1) the
nature, location, onset, duration, frequency, and intensity
of the pain; (2) precipitating and aggravating factors, such
as movement or activity; (3) the effect of pain medication,
including type, dosage, or any adverse side-effects; (4)
non-medicative treatment for the pain; (5) functional
restrictions; and (6) the claimant's daily activities.

In reviewing a decision by the Commissioner, the findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must defer to the Commissioner on the resolution of conflicts in the evidence and uphold the Commissioner's decision "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." Rodriguez v. Sec'y of Health & Human Svcs., 647 F.2d 218, 222 (1st Cir. 1981). Nonetheless, where the Commissioner has committed "a legal or factual error in evaluating a particular claim," the court must vacate and remand for further proceedings. Manso-Pizarro v. Sec'y of Health & Human Svcs., 76 F.3d 15, 16 (1st Cir. 1996) (internal quotations omitted).

B.  Basis for Remand

Plaintiff disputes the ALJ's step three determination that his impairments do not meet or equal a listed impairment and the finding that the only non-exertional limitations placed on Plaintiff were that he be isolated from the general public and have only occasional contact with others. He presents three challenges to the ALJ's

decision.  First, the ALJ's credibility determination was improper.  Second, the ALJ committed reversible error in relying on Plaintiff's GAF scores.  Finally, the ALJ improperly discounted Plaintiff's treating therapist's opinion.

Plaintiff's first argument questions the ALJ's reliance, in weighing Plaintiff's credibility, on Plaintiff's alleged criminal history, his failure to follow medical advice, and his feigning a limited command of English.  According to Plaintiff, the ALJ's use of these factors in the <u>Avery</u> credibility assessment was improper.  After a careful review of the record, the court is obliged to agree.

Regarding the question of Plaintiff's criminal history, it is important to note that the record contains no evidence that Plaintiff has ever been convicted of any crime.  In reaching his conclusion on this point, the ALJ appears to have relied solely on the vague notation in the Gandara intake form that Plaintiff admitted to being arrested for "taking something that did not belong to him."  (A.R. 365.)  The record does confirm the Commonwealth of Massachusetts

entered a nolo prosequi on a charge of larceny in March
2006, which may perhaps have been what the note was
referring to.  (A.R. 260-61.)  No other evidence exists in
the record that could support the ALJ's conclusion that
Plaintiff had been convicted of "a crime of moral
turpitude."  (A.R. 22.)  The absence of record support for
the ALJ's conclusion on such a potentially serious matter
seriously weakens support for his conclusion on credibility.
Cf. Aldea v. Astrue, 828 F. Supp. 2d 396, 401 (D. Mass 2011)
(criticizing the ALJ's reliance on earnings statements that
the plaintiff disputed and that were not in the record and
stating that consideration of evidence outside the record
"constitutes a serious failure"); Tornatore v. Barnhart,
2006 WL 3714649 at *5 (S.D.N.Y. Dec. 12, 2006) (stating that
a court "cannot evaluate whether the ALJ's conclusion is
supported by substantial evidence" if the evidence relied on
is not in the record).  The problem is especially worrisome
on the record in this case, since the ALJ never brought the
subject of criminal history up in the hearing, and Plaintiff
had no opportunity to address the ALJ's concerns.

        Defendant is correct that, generally speaking, an ALJ

may properly find that a plaintiff's criminal past casts light on his or her veracity.  See Smith v. Astrue, 851 F. Supp. 2d 305, 309 (D. Mass. 2012); Bell v. Colvin, 2013 WL 1163956, *3 (C.D. Cal. March 20, 2013) (stating that a crime of moral turpitude is a proper basis for an adverse credibility finding).  It is also true that ALJs may, in some circumstances, consider reliable hearsay statements found in a plaintiff's treatment records.  42 U.S.C. § 405(b)(1) ("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under the rules of evidence applicable to court procedure.").

No persuasive authority suggests, however, that an arrest alone -- without a subsequent conviction -- can form a significant portion of the basis for rejecting a plaintiff's credibility.  See Smith v. Astrue, 2010 WL 3420278 at *6 (W.D. Okla. July 30, 2010), report and recommendation adopted by 2010 WL 3420272 (W.D. Okla. Aug. 27, 2010, (finding that there was nothing in the record to support the ALJ's contention that the plaintiff was convicted of a felony charge and concluding that the "ALJ's

<u>ex</u> <u>parte</u> consideration of evidence not included in the
record thus requires reversal on due process grounds")
(emphasis in original).

The questionable reliance on Plaintiff's criminal
history was compounded by the ALJ's skepticism about
Plaintiff's command of English. Early on in the hearing,
the following exchange occurred:

> Q: So, Mr. Velez, you have how much education? How
> much school do you have?
> A[8]: Second year of high school, that means 10th grade,
> Your Honor. So he didn't finish, but he got a
> GED.
> Q: Okay, Very good. But you never learned to speak
> English though?
> A: Very little.
> Q: Okay. Can you read English?
> A: Almost nothing.

(A.R. 40.) Then, several questions later, the ALJ returned
to the subject.

> Q: Can you tell me how it is that you can testify to
> me that you speak very little English yet the
> psychologist who interviewed you was of the
> impression that you communicated fairly well in
> English?
> A: I speak very little and the majority of the time,
> people -- people don't understand me very well
> because I don't speak very well.
> Q: Did the psychologist, to your knowledge, speak
> Spanish to you ever? Dr. -- Dr. Wing? W-I- -

---

[8] Plaintiff answered the questions via a translator.

22

```
             g[sic]?
    A:   He was -- he or she was supposed to have an
         interpreter.
    Q:   He. He. He.
    A:   He -- the interpreter never got there and I tried
         the best I could.
    Q:   Hm.  Well, because it seems to me from looking at
         what he wrote, he was able to get a fairly
         extensive history about you despite there being no
         interpreter present. So -- do you have any idea
         how that could happen or no?
    A:   I -- I speak very little.  Sometimes I know some
         words, sometimes I don't.  I consider that I'm
         very limited.
    Q:   All right.
    A:   I had problems at work because of that.
    Q:   All right.  Well, let's move on to another subject
         then. ...
```

(A.R. 42-3.)

The ALJ appears to have relied on Dr. Wing's reference
to conclude, or at least suspect, that Plaintiff was
deceptively minimizing his command of English at the
hearing.  This was improper.  The atmosphere at a formal
hearing is quite different from what Plaintiff confronted in
the examination with Dr. Wing.  Plaintiff clearly expected a
translator for the examination and simply did the best he
could when no one showed up.  He should not be penalized for
making this effort.  It may have been reasonable for the ALJ
to make a determination respecting Plaintiff's English-

speaking abilities for purposes of weighing his education as a vocational factor. 20 C.F.R. § 404.1564(b)(5) (listing ability to communicate in English as a factor in determining what work a claimant can perform). However, the ALJ's use of Plaintiff's discomfort with his English skill as a basis to find Plaintiff's "allegations of disability less than fully credible," (A.R. 22), was improper. Reliance on this factor raises a serious risk of unfairness.

It is true that the ALJ, as Defendant points out, identified other reasons to support his finding that Plaintiff was not fully credible, including the inconsistent reports of Plaintiff's ability to socialize and the conflicting evidence regarding the severity of Plaintiff's musculoskeletal problems. Credibility, however, was a critical issue in this case -- perhaps the central issue -- and the ALJ's reliance on factors that should have been off limits leaves the court without confidence in the ALJ's conclusion. Though an ALJ's credibility determination is generally entitled to deference from the court, "deference has its limits." Bass v. Astrue, 2011 WL 31296 at *2 (D. Mass. Jan. 4, 2011).

Moreover, there are serious questions regarding at least one other cited basis for the credibility determination. The ALJ stated that Plaintiff failed to follow his physician's advice with respect to his weight. However, the ALJ provides no reference to the record to support this contention. (A.R. 22.) The court found only one earlier reference to a single doctor's notation that Plaintiff "is aware that he is overweight and inactive," (A.R. 616). "The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician." Gonzalez Perez v. Sec'y of Health & Human Svcs., 812 F.2d 747 (1st Cir. 1987). No evidence in the record suggests that the physician's general comment on Plaintiff's weight was intended to prescribe a regimen of weight loss or that the doctor concluded that losing weight or increasing activity would have restored Plaintiff's capacity in any meaningful way. See SSR 82-59, 1975-1982 Soc. Sec. Rep. Serv. 793.

In sum, the absence of evidence on Plaintiff's criminal history and the insufficient evidence of Plaintiff supposedly feigning his difficulties with English raise too

great a risk of unfairness.  See <u>Smith</u>, 2010 WL 3420278 at *6 ("The ALJ's <u>ex</u> <u>parte</u> consideration of evidence not included in the record thus requires reversal on due process grounds.").  Given the defects in the ALJ's credibility determination, coupled with the centrality of the credibility issue to the ALJ's decision, it is not necessary to address the other grounds for remand asserted by Plaintiff.  Once the credibility analysis falls, the court cannot conclude that the remainder of the ALJ's decision is supported by sufficient evidence in the record.

### IV.  <u>CONCLUSION</u>

The medical evidence in this case was complex and, to some extent, inconsistent.  This ambiguity made Plaintiff's credibility unusually important.  Because this critical issue was not properly assessed, a remand is required.  For the reasons set forth in this memorandum, Plaintiff's motion is ALLOWED (Dkt. No. 18), and Defendant's motion is DENIED (Dkt. No. 24).  The case is remanded to a new ALJ for a reassessment of Plaintiff's credibility.

It is So Ordered.

_____/s/ Michael A. Ponsor_____
MICHAEL A. PONSOR
U. S. District Judge